609 S.E.2d 895

**Brad BOWYER, Plaintiff
Below, Appellee**

v.

**HI–LAD, INC., d/b/a Comfort Inn of
Charleston, a West Virginia corporation,
Defendant Below, Appellant.**

and

**Westfield Insurance Company, Intervenor
Below, Appellee.**

and

**Security & Surveillance, Inc., Third-party
Defendant Below, Appellee.**

No. 31697.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 14, 2004.

Decided Dec. 3, 2004.

Brent K. Kesner, Esq., Ellen R. Archibald, Esq., Kesner, Kesner & Bramble, PLLC, Charleston, West Virginia, Attorneys for Appellee Westfield Insurance Company.

Ancil G. Ramey, Esq., Hannah B. Curry, Esq., Steptoe & Johnson, PLLC, Andrew L. Paternostro, Esq., Atkinson, Mohler & Polak, Charleston, West Virginia, Attorneys for Appellee Security & Surveillance, Inc.

PER CURIAM:

In this appeal from the Circuit Court of Kanawha County, the appellant corporation seeks review of a jury verdict holding the appellant liable for intercepting the private conversations of an employee of the appellant through the use of hidden microphones in the workplace. The appellant challenges the circuit court's decision to uphold the jury's verdict. The appellant also challenges a circuit court order granting summary judgment to the company that manufactured and installed the microphones, and thereby dismissing the appellant's third-party complaint for contribution or indemnification. Lastly, the appellant contends that the circuit court erred in declaring that the appellant was not entitled to coverage or a legal defense under an insurance policy purchased by the appellant.

After careful review of the trial transcript, the briefs and arguments of the parties, and the relevant statutory and case law, we conclude that the circuit court correctly upheld the jury's verdict. Further, we find the circuit court properly dismissed the company that manufactured and installed the hidden microphones. We affirm the circuit court's decisions on these two points.

However, we conclude that the appellant is entitled to insurance coverage and a legal defense under its insurance policy, and reverse the circuit court's decision on this point.

James B. Lees, Jr., Esq., Sharon F. Iskra, Esq., Hunt & Lees, L.C., Charleston, West Virginia, Attorneys for Appellee Brad Bowyer.

Rudolph L. DiTrapano, Esq., Sean P. McGinley, Esq., DiTrapano, Barrett & DiPiero, PLLC, Charleston, West Virginia, Attorneys for Appellant Hi–Lad, Inc.

I.

The appellant, Hi–Lad, Inc., is an independent owner of a 112 room "Comfort Inn"

hotel franchise in Cross Lanes, West Virginia. In 1998, appellee Security & Surveillance, Inc. ("SSI") approached the owner of the appellant, Greg Hicks, and offered to professionally install an electronic surveillance system. Mr. Hicks initially leased, and later purchased, a surveillance system from SSI and executed a written contract in which Hi–Lad, Inc., agreed to indemnify SSI for any loss arising out of Hi–Lad's use of the equipment. The system that Mr. Hicks had installed consisted of cameras and microphones at three public locations within the hotel: the front desk, the lobby, and the hotel bar.[1] Mr. Hicks contends that he was reassured by the SSI salesman that the system was "completely legal" in West Virginia.

Appellee Brad Bowyer was hired by the appellant in April 2000 to work as a front desk clerk. Mr. Bowyer noticed the surveillance cameras in public areas and was not concerned. However, several days after beginning his employment, a fellow employee stated to Mr. Bowyer that there were microphones hidden in the hotel. Mr. Bowyer immediately asked an assistant manager whether this was true, and was told that there were microphones but that they had been disconnected.

In late May or early June 2000, surveillance monitoring equipment—including a television set, a videotape recorder, and a speaker—appeared in the manager's office directly off the front desk of the hotel. The monitoring equipment had originally been located and operated in a locked, upstairs manager's office that was accessible by only two people.

At some point in June 2000, Mr. Bowyer noticed the monitoring equipment and again approached the assistant manager to ask her about the existence of microphones. Again, Mr. Bowyer was reassured that the microphones were disconnected.

In and about this period, while he was working at the front desk, Mr. Bowyer heard

a sound coming from the computer in the manager's office that sounded like a telephone dial-up when a computer modem connects to the internet. At this point, Mr. Bowyer asked one of the hotel managers about the source of the sound:

> And I asked [the manager] what that was, and she said it was Mr. Hicks dialing into the system so that he could monitor our activities, both oral and visually, so he could keep an eye on his investment.

Around the same time period, Mr. Bowyer entered the manager's office with the monitoring equipment, turned one knob on the equipment and immediately heard audio information coming over the system from microphones in areas of the hotel.

Mr. Bowyer thereafter sought the advice of an attorney, and upon returning to work photographed the surveillance monitoring equipment in the manager's office. Mr. Bowyer also ejected a videotape from the inside of the videotape recorder and took the tape.

On August 17, 2000, Mr. Bowyer filed a single-count complaint against the appellant with the circuit court. The complaint alleged that appellee Bowyer had been subjected to "illegal oral surveillance by electronic surveillance apparatus owned and operated by the [appellant]" in violation of the West Virginia Wiretapping and Electronic Surveillance Act, W.Va.Code, 62–1D–1 to—16. The complaint demanded actual and punitive damages, reasonable attorney's fees and costs, and pre- and post-judgment interest.

Appellant Hi–Lad, Inc. sought coverage and a legal defense for Mr. Bowyer's lawsuit from its commercial general liability insurance company, appellee Westfield Insurance Company ("Westfield"). Westfield responded by filing a motion to intervene in the case pursuant to Rule 24 of the West Virginia Rules of Civil Procedure, and filed a complaint against the appellant seeking a declaratory judgment that there was no coverage

[1] There are also indications in the record that, for at least some period of time, a camera and a microphone were also installed to observe the hotel's public hot tub.

for Mr. Bowyer's lawsuit under the liability policy purchased by the appellant.

The circuit court entered an order allowing Westfield to intervene on December 1, 2000. The circuit court initially ruled that Westfield was required to defend and indemnify Hi–Lad, Inc. However, after extensive discovery between the parties, on September 5, 2001, the circuit court entered an order declaring that Westfield had no duty to defend or indemnify the appellant, and dismissing Westfield from the case.

Thereafter, on April 3, 2002, appellant Hi–Lad, Inc. filed a third-party complaint against SSI seeking contribution or indemnification for Mr. Bowyer's lawsuit. The third-party complaint alleged that SSI was guilty of negligence in failing to make proper disclosures about the surveillance system, negligence that was the proximate cause of Mr. Bowyer's damages.

Appellee SSI filed a motion for summary judgment, a motion that was granted by the circuit court on October 1, 2002. The circuit court concluded that, as a matter of law, no cause of action exists under the Wiretapping and Electronic Surveillance Act against the manufacturer of electronic equipment that is used by a purchaser in violation of the statute. Thus, because Mr. Bowyer could not maintain a cause of action against SSI for manufacturing or installing the hidden microphones, appellant Hi–Lad, Inc. similarly could not maintain a cause of action against SSI for contribution. Furthermore, the circuit court concluded that appellant Hi–Lad, Inc.'s claim for indemnification should be dismissed because the appellant was charged,

by operation of law, with knowledge of its obligations under the Act; the appellant therefore could not claim to be without fault. Lastly, the circuit court prohibited the appellant from amending its third-party complaint to add other causes of action because of the passage of the statute of limitation, and because of the indemnification language in the SSI contract that would, in the end, require Hi–Lad, Inc. to repay SSI for all of its losses and expenses.

The case proceeded to trial, and on February 6, 2003, a jury returned a verdict in favor of the appellee, Mr. Bowyer. The jury found that the appellant had engaged in unlawful electronic surveillance and awarded Mr. Bowyer $100,000.00 in compensatory damages and $400,000.00 in punitive damages. A judgment order was entered by the circuit court on April 11, 2003. The appellant filed post-trial motions for judgment as a matter of law or for a new trial that were denied by the circuit court on May 30, 2003.

The appellant now appeals the jury's verdict, as well as the circuit court's September 5, 2001 order declaring that Westfield had no duty to indemnify or defend the appellant, and the circuit court's October 1, 2002 order granting summary judgment to SSI.

## II.

▇▇▇ Rule 50(b) of the *Rules of Civil Procedure* [1998] provides that, in ruling upon a motion for judgment after a verdict is returned, a circuit court may: (a) allow the judgment to stand, (b) order a new trial or (c) direct the entry of judgment as a matter of law.[2] As we stated in Syllabus Point 6 of

---

**2.** Rule 50(b) of the *Rules of Civil Procedure* states:

(b) Renewal of Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew the request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment and may alterna-

tively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) If a verdict was returned:
(A) allow the judgment to stand,
(B) order a new trial, or
(C) direct entry of judgment as a matter of law; or
(2) if no verdict was returned:
(A) order a new trial, or
(B) direct entry of judgment as a matter of law.

*Huffman v. Appalachian Power Co.,* 187 W.Va. 1, 415 S.E.2d 145 (1991):

In considering whether a motion for judgment notwithstanding the verdict under Rule 50(b) of the West Virginia Rules of Civil Procedure should be granted, the evidence should be considered in the light most favorable to the plaintiff, but, if it fails to establish a *prima facie* right to recover, the court should grant the motion.

That standard is consistent with Syllabus Point 5 of *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1983) which states:

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Our reviewing standard for denial of a new trial motion was articulated in *Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995):

We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

▮ The appellant also seeks review of the circuit court's ruling that it is not entitled to indemnification or a defense under the Westfield liability policy. In this regard, we have held that the "[d]etermination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." Syllabus Point 1, *Tennant v. Smallwood,* 211 W.Va. 703, 568 S.E.2d 10 (2002). "Where the issue on an appeal from the circuit court is clearly a question of law

..., we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995). Thus, "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement, shall be reviewed *de novo* on appeal." Syllabus Point 2, *Riffe v. Home Finders Associates, Inc.,* 205 W.Va. 216, 517 S.E.2d 313 (1999).

▮ Likewise, this case comes to us procedurally as an appeal from an order granting summary judgment to SSI. As we noted above with respect to our review of questions of law, we apply a plenary review to summary judgment decisions. "A circuit court's entry of summary judgment is reviewed *de novo.*" Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). Within the context of these guidelines, we will proceed to consider the parties' arguments.

### III.

### A.

*Jury's Verdict*

▮ The appellant challenges the jury's verdict in favor of the appellee Mr. Bowyer on several grounds, and contends that on the existing record, the circuit court should have granted judgment in favor of the appellant.

Mr. Bowyer filed the instant lawsuit under the West Virginia Wiretapping and Electronic Surveillance Act, alleging that the appellant improperly intercepted Mr. Bowyer's conversations in various parts of the hotel through the use of hidden microphones. The Act, *W.Va.Code,* 62–1D–3(a) [1987], states in part that:

[I]t is unlawful for any person to:

(1) Intentionally intercept, attempt to intercept or procure any other person to intercept or attempt to intercept, any wire, oral or electronic communication; or

(2) Intentionally disclose or intentionally attempt to disclose to any other person the

contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this article; and

(3) Intentionally use or disclose or intentionally attempt to use or disclose the contents of any wire, oral or electronic communication or the identity of any party thereto, knowing or having reason to know that such information was obtained through the interception of a wire, oral or electronic communication in violation of this article.

The Act allows certain individuals who are injured by the violation of the Act to bring a lawsuit for compensatory and punitive damages, and attorney's fees and litigation expenses. *W.Va.Code*, 62–1D–12 [1987] states, in pertinent part:

(a) Any person whose wire, oral or electronic communication is intercepted, disclosed, used or whose identity is disclosed in violation of this article shall have a civil cause of action against any person who so intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and shall be entitled to recover from any such person or persons:

(1) Actual damages, but not less than one hundred dollars for each day of violation;

(2) Punitive damages, if found to be proper; and

(3) Reasonable attorney fees and reasonable costs of litigation incurred.

The appellant asserts that there is no evidence in the trial record by which a jury could conclude that the appellant intentionally intercepted Mr. Bowyer's oral communications. The Act, *W.Va.Code*, 62–1D–2(e) [1987], defines "intercept" as follows:

"Intercept" means the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device.

The appellant argues that the trial court should have granted judgment to the appellant because Mr. Bowyer testified on cross examination at trial that he had no knowledge that anyone had ever used the hotel surveillance system to listen to his conversations.[3]

■ After examining the trial record in the instant case, it appears that the appellant's argument really is that there is no *direct* evidence that the appellant intercepted Mr. Bowyer's conversations within the hotel. There is however, sufficient *circumstantial* evidence that the jury could conclude that the appellant acquired the contents of Mr. Bowyer's oral communications through the use of an electronic device. As we have stated before, "there is no qualitative difference between direct and circumstantial evidence" when considering whether there is sufficient evidence to support a jury's verdict. *State v. Guthrie*, 194 W.Va. 657, 669, 461 S.E.2d 163, 175 (1995). As we stated in Syllabus Point 3 of *Walker v. Monongahela Power Co.*, 147 W.Va. 825, 131 S.E.2d 736 (1963), "[i]n determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true."

At trial, Mr. Bowyer introduced into evidence, without objection by the appellant, a videotape which was taken by Mr. Bowyer from the surveillance monitoring equipment in the hotel's front office, and which contains over four hours of both video and audio interceptions of hotel employees and mem-

---

3. Specifically, Mr. Bowyer testified to the following:

Q. Isn't it true Mr. Bowyer, that you have no knowledge whatsoever that anyone ever lis-

tened to a conversation of yours over this security system?

A. That's correct.

bers of the public speaking in the vicinity of the hotel's front desk and the hotel bar. While Mr. Bowyer does not appear on the tape, the tape does include other hotel employees and members of the public talking on telephones to other unidentified persons; members of the public reciting credit card information and other personal and private information; private conversations by and between hotel employees, including conversations about romance; and portions of conversations that occurred between individuals in the bar area of the hotel. The evidence is uncontroverted that the audio recordings of the hotel employees and the members of the general public were the result of electronic interceptions made without the consent of these individuals.

This videotape stands in stark contrast to statements made by Gregory Hicks, the owner of the appellant, whose deposition testimony was read to the jury in the plaintiff's case-in-chief. Mr. Hicks testified that he knew microphones were installed with the surveillance system in the hotel—hidden in the front desk area, the lobby area, and the bar—but denied that recordings were ever made using those microphones:

Q. I believe in looking through your answers to interrogatories that it is Hi–Lad's position that videotapes of surveillance were never made; is that correct?

A. That's correct.

Q. And audiotapes of surveillance were never made, correct?

A. That's correct.

After being shown photographs of the surveillance monitoring equipment, where several videotapes are seen lying near the equipment, Mr. Hicks again stated:

Q. It's still your position on behalf of Hi–Lad, Inc. that there were no tapes made of surveillance; is that correct?

A. That's correct.

At trial, Mr. Hicks testified during the defendant's case-in-chief that he had planned to use the videotaping system when the surveillance equipment was installed in 1998, but that plan had never been implemented and he had no idea who put the videotape into the machine.

Mr. Hicks also testified that the surveillance system was connected to a computer modem which allowed him to dial in to the hotel from his home by telephone and "remotely access both the video feed and the audio feed[.]" Mr. Bowyer testified that once, while working at the front desk, he heard a sound like a computer modem making a telephone connection coming from the manager's office with the surveillance equipment. The hotel manager, when asked about the sound, stated that "it was Mr. Hicks dialing into the system so that he could monitor our activities, both oral and visually, so he could keep an eye on his investment." Mr. Hicks, when asked directly whether he listened to the oral communications of his employees, asserted his rights under the Fifth Amendment to the *United States Constitution* not to answer that question.

Lastly, the appellant made the argument at trial—and asserts here as a matter of public policy—that the surveillance system installed by the appellant in 1998 was necessary for the security of hotel employees and the public. The appellant contends that the system was installed after an employee was suspected of stealing from the hotel manager's safe. However, at trial, Mr. Hicks admitted that the cameras did not show the office where the safe was located. And a hotel manager testified at trial that, until June 2000, the surveillance monitoring equipment was locked in a manager's upstairs office that was only accessible by two employees. The manager also admitted that no one was assigned to watch the monitoring equipment.

Taken together, we believe that the jury could reasonably infer from the evidence admitted at trial that the appellant had both installed and used hidden microphones to acquire the contents of oral conversations by hotel employees and members of the public. Further, the jury could reasonably infer from

the evidence that Mr. Bowyer's oral communications had similarly been acquired and even recorded. In sum, we believe the jury could properly conclude that the appellant intercepted Mr. Bowyer's oral communications in contravention of the Wiretapping and Electronic Surveillance Act.

■ The appellant next asserts that hotel clerks like Mr. Bowyer, who work in a public place, have no expectation of privacy; therefore, any recordings of conversations in those public places would be permitted by the Act.[4] The appellant directs our attention to the definition of "oral communication" in the Act, which states:

> "Oral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication.

Because the appellee's job responsibility and job area included no private space, the appellant argues the appellee had no expectation of conversational privacy while working.

Appellee Mr. Bowyer contends that the appellant is essentially asking the Court to rewrite the Act so as to exempt certain businesses and employers from the prohibitions contained in the statute. Mr. Bowyer points

out that federal and state law enforcement officers must apply for and receive a court order in advance before attempting to intercept the conversations of suspected criminals with hidden microphones.[5] The appellee takes the position that the appellant is asking this Court to interpret the Act to allow employers to surreptitiously listen to the oral communications of workers, a power that is specifically denied to law enforcement officers under the Act. We agree.

■ "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syllabus Point 5, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959). The Act plainly prohibits *any* person from intentionally acquiring another person's oral communications through the use of some electronic or mechanical device, when that other person has a reasonable expectation that their conversation is not subject to being acquired by an electronic or mechanical device. Most employees, even those working in "public" spaces, have a reasonable expectation that their oral communications with other employees or with customers are not going to be recorded by hidden microphones.[6] The jury in the instant case could properly conclude

---

4. In support of its argument that Mr. Bowyer had no legitimate expectation of privacy anywhere in the workplace, the appellant cites to the employee manual given to Mr. Bowyer which states: "HI–LAD, Inc. property ... should only be used for conducting company business." The employee manual also states that: "Individuals using HI–LAD, Inc's business equipment should also have no expectation that any information stored on their computer ... or in any other manner—will be private." The appellant also suggests that the Court should take judicial notice that the front desk of a hotel is inherently public in nature, and that therefore no person working in such a position could possibly expect that their oral communications—whether to a co-worker or a member of the general public—would be private. We, however, do not give the evidence of record or the Act the same generous interpretation as the appellant; to do so, an individual such as Mr. Bowyer would have to presume not only that the workplace is not a

private place, but that the workplace is also festooned with hidden listening devices.

5. *See, e.g., W.Va.Code*, 62–1D–8 [1987] ("The prosecuting attorney of any county ... may apply to one of the designated circuit judges ... and such judge, in accordance with the provisions of this article, may grant an order authorizing the interception of wire, oral or electronic communications by an officer of the investigative or law-enforcement agency[.]")

6. We note, however, that if one of the parties to the communication consents to the interception, and the purpose of the interception does not constitute a criminal or tortious act, then the interception is permitted by the Act. The Act, *W.Va.Code*, 62–1D–3(c)(2) [1987], states in part:

> It is lawful under this article for a person to intercept a wire, oral or electronic communication where the person is a party to the communication or where one of the parties to the

that under the circumstances Mr. Bowyer was justified in expecting that his oral communications would not be subject to electronic interception.

■ Lastly, the appellant challenges the jury's verdict by arguing that the appellee introduced insufficient evidence of emotional distress to support the jury's award of $100,000.00 in compensatory damages. The appellant argues that this Court has held that "isolated and conclusory statements by the plaintiff as to his or her emotional state are not sufficient to prove emotional and mental distress damages." *Slack v. Kanawha County Housing and Redevelopment Auth.*, 188 W.Va. 144, 151, 423 S.E.2d 547, 554–55 (1992). The appellant asserts that Mr. Bowyer gave only bald conclusory statements of emotional distress during his testimony, but gave no testimony of how this distress manifested itself or impacted him.

Appellee Bowyer, however, asserts that he sufficiently detailed the embarrassment and distress he suffered as a result of having his private conversations unlawfully intercepted, and his humiliation when he learned he had been deceived by the appellant about the hidden microphones. Further, the appellee points out that the Act allows Mr. Bowyer to recover "[a]ctual damages, but not less than one hundred dollars for each day of violation[.]" *W.Va.Code*, 62–1D–12(a)(1) [1987]. The appellee therefore contends that the jury's verdict was proper.

The Act accords a jury considerable leeway in awarding a person whose communications have been intercepted their actual damages, and goes so far as to require the jury to award a minimum of $100.00 in damages for each day that the Act is violated. Giving every reasonable and legitimate inference to the evidence in favor of appellee Bowyer, Syllabus Point 3, *Walker v. Monongahela Power Co.*, *supra*, the record supports the

jury's finding that appellee Bowyer sustained a significant measure of embarrassment, humiliation and distress upon discovering that the appellant had been secretly intercepting his conversations over a four-month period, while simultaneously deceiving the appellee about the existence of any operable hidden microphones. Based upon our examination of the record and the language of the Act, we cannot say that the jury's verdict was in error.

In sum, we find no error by the circuit court in upholding the jury's verdict, and in denying the appellant's motions for a new trial or for a judgment as a matter of law.

### B.

#### *Punitive Damages*

The appellant argues that the circuit court erred in permitting the jury to consider and make an award of punitive damages. The appellant also argues that the punitive damages award of $400,000.00 bears no reasonable relationship to the harm suffered by appellee Bowyer.

■ The appellant first argues that the damages available under the Act are essentially damages for intentionally inflicted emotional distress. The appellant then argues, pursuant to our holding in Syllabus Point 14 of *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997), that when a jury is presented with an intentional infliction of emotional distress claim, but the plaintiff can show no physical trauma or medical or psychiatric proof of emotional or mental trauma, any award of emotional distress damages to the plaintiff is presumed to (at least partly) encompass an award of punitive damages. Accordingly, any additional award of punitive damages in an intentional infliction of emotional distress claim constitutes, to some extent, "an impermissible double recovery." [7] The appellant appar-

communication has given prior consent to the interception unless the communication is intercepted for the purpose of committing any criminal or tortious act in violation of the

constitution or laws of the United States or the constitution or laws of this state.

7. Syllabus Points 14 and 15 of *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506

ently therefore contends that a plaintiff cannot recover both compensatory damages and punitive damages for violations of the Wiretapping and Electronic Surveillance Act. We disagree.

First, we have specifically limited our holding in *Tudor* to only causes of action for intentional or reckless infliction of emotional distress. We stated, in Syllabus Point 11 of *Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 209 W.Va. 318, 547 S.E.2d 256 (2001), that "[t]he specific principles and procedures established in Syllabus Points 14 and 15 of *Tudor* . . . are limited to the tort of the intentional or reckless infliction of emotional distress." Furthermore, the Act specifically states that any person whose oral communications are intercepted may recover "[p]unitive damages, if found to be proper[.]" *W.Va.Code*, 62–1D–12 (a)(3). We decline the appellant's invitation to extend *Tudor*, and thereby interpret the Act so as to preclude the recovery of punitive damages.

The appellant also argues that the amount of the punitive damage award is excessive, and bears no reasonable relationship to the evidence. The appellant points out that there is a two-step process for reviewing punitive damages:

> S.E.2d 554 (1997) state:
> 14. In cases where the jury is presented with an intentional infliction of emotional distress claim, without physical trauma or without concomitant medical or psychiatric proof of emotional or mental trauma, i.e. the plaintiff fails to exhibit either a serious physical or mental condition requiring medical treatment, psychiatric treatment, counseling or the like, any damages awarded by the jury for intentional infliction of emotional distress under these circumstances necessarily encompass punitive damages and, therefore, an additional award for punitive damages would constitute an impermissible double recovery. Where, however, the jury is presented with substantial and concrete evidence of a plaintiff's serious physical, emotional or psychiatric injury arising out of the intentional infliction of emotional distress, i.e. treatment for physical problems, depression, anxiety, or other emotional or mental problems, then any compensatory or special damages awarded would be in the nature of compensation to the injured plaintiff(s)

Our punitive damage jurisprudence includes a two-step paradigm: first, a determination of whether the conduct of an actor toward another person entitles that person to a punitive damage award under *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895); second, if a punitive damage award is justified, then a review is mandated to determine if the punitive damage award is excessive under *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).

Syllabus Point 7, *Alkire v. First Nat. Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996).

On the first step, the appellant contends that its conduct in surreptitiously recording the conversations of employees does not constitute "gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others" so as to support an award of punitive damages. *See* Syllabus Point 4, in part, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895). We disagree, and believe that the jury in the instant case properly assessed whether or not the conduct of the appellant was sufficiently grievous and of such indifference to the privacy rights of others to warrant an award of punitive damages.

> for actual injury, rather than serving the function of punishing the defendant(s) and deterring such future conduct, a punitive damage award in such cases would not constitute an impermissible double recovery. To the extent that this holding conflicts with our decision in *Dzinglski v. Weirton Steel Corp.*, 191 W.Va. 278, 445 S.E.2d 219 (1994), it is hereby modified.
> 15. Where a jury verdict encompasses damages for intentional infliction of emotional distress, absent physical trauma, as well as for punitive damages, it is incumbent upon the circuit court to review such jury verdicts closely and to determine whether all or a portion of the damages awarded by the jury for intentional infliction of emotional distress are duplicative of punitive damages such that some or all of an additional award for punitive damages would constitute an impermissible double recovery. If the circuit court determines that an impermissible double recovery has been awarded, it shall be the court's responsibility to correct the verdict.

On the second step, the appellant argues that there was no meaningful constraint upon the jury's discretion, and no meaningful and adequate review of the jury's verdict by the circuit court, as required by *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).

 Syllabus Point 3 of *Garnes* requires a jury to carefully consider the following factors in determining whether punitive damages are warranted and the amount of any punitive damage award:

> When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:
>
> (1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.
>
> (2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.
>
> (3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.
>
> (4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.
>
> (5) The financial position of the defendant is relevant.

If a jury awards punitive damages to a litigant, a circuit court must carefully review the jury's verdict applying the five factors contained in Syllabus Point 3 of *Garnes*, as well as several other factors. As we held in Syllabus Point 4 of *Garnes*:

> When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:
>
> (1) The costs of the litigation;
>
> (2) Any criminal sanctions imposed on the defendant for his conduct;
>
> (3) Any other civil actions against the same defendant, based on the same conduct; and
>
> (4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.

In the instant case the jury was properly instructed on the factors contained in Syllabus Point 3 of *Garnes*. The jury's $400,000.00 verdict bears a reasonable relationship to the jury's $100,000.00 compensatory damage determination, and is in accord with the harm that is likely to occur to privacy interests when a business owner hides microphones in public places to record the conversations of both employees and the general public. The jury could rightly conclude that the appellant had, for at least two years, been secretively monitoring oral communications of employees and hotel patrons, had attempted to conceal or cover up its actions, and had made no effort to make amends for its transgression. Finally, the appellant has not been exposed to punitive damages, criminal sanctions, or excessive litigation expenses as a result of its misconduct, all factors which might merit a reduction by the circuit court of a punitive damage award as specified in Syllabus Point 4 of *Garnes*.

The circuit court's May 30, 2003 order denying the appellant's post trial motions does not specifically note whether or how the circuit court applied the factors contained in Syllabus Points 3 and 4 of *Garnes*. However, we have carefully reviewed the record in light of those factors, and accordingly we find that the jury's punitive damage award is supported by the record, and the circuit court committed no error by refusing to set aside or reduce that verdict.[8]

### C.

#### *Coverage under the Westfield Insurance Policy*

■ The appellant submits that the circuit court erred when it ruled that no insurance coverage was available to the appellant under the commercial insurance policy purchased from Westfield.

8. The appellant also contends that it is entitled to judgment as a matter of law because the use of the surveillance system was privileged; because the appellant was immune pursuant to the Workers' Compensation Act; and because of the existence of another, more specific statute, *W.Va.*

The insurance policy at issue provides that Westfield will "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages." The policy defines "personal and advertising injury" as follows:

"Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

\*　　\*　　\*　　\*　　\*　　\*

e. Oral or written publication of material that violates a person's right to privacy.

The circuit court concluded that because there was no oral or written publication of any material relating to Mr. Bowyer by the appellant, no personal or advertising injury had occurred.

The appellant argues that appellee Westfield must meet a high standard of proof to avoid its obligation to provide a defense under its insurance policy. The appellant points out that the term "publication" is not defined in the Westfield policy, and argues that other courts have concluded that the word "publication" as used in the policy is ambiguous. The appellant therefore contends that the ambiguous word "publication" should be construed against Westfield to cover Mr. Bowyer's claim that the appellant used the surveillance system to capture his oral communications, and then publish that audio material through speakers to the officers and employees of the appellant. *See Hooters of Augusta, Inc. v. American Global Ins. Co.*, 272 F.Supp.2d 1365, 1378 n. 12 (S.D.Ga.2003) (holding the word "publication" is ambiguous); *Western Rim Investment Advisors v. Gulf Ins. Co.*, 269 F.Supp.2d 836,

*Code*, 21–3–20(a) [1999], which prohibits any surveillance of employees in personal comfort areas such as restrooms, showers, locker rooms and lounges. We find no merit to these arguments.

846 (N.D.Tex.2003) ("[T]here is nothing in the CGL policy indicating that the word 'publication' necessarily means communicating the offending material to a third party."); *TIG Ins. Co. v. Dallas Basketball, Ltd.*, 129 S.W.3d 232 (Tex.Ct.App.2004) (holding that "publication" is not limited to utterance and disclosure to third parties because the policy did not define the term); *American States Ins. Co. v. Capital Associates of Jackson County, Inc.*, 2003 WL 23278656, *7 (S.D.Ill. 2003) ("The Policies do not indicate that the word 'publication' necessarily means communicating the offending material to a third-party as required in the defamation context.")

■ With respect to general aspects of contractual interpretation involving insurance policies, we have held that "[i]t is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." Syllabus Point 4, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987). *See also Horace Mann Ins. Co. v. Leeber*, 180 W.Va. 375, 378, 376 S.E.2d 581, 584 (1988) ("[A]ny ambiguity in the language of an insurance policy is to be construed liberally in favor of the insured, as the policy was prepared exclusively by the insurer." (citation omitted)); *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W.Va. 190, 194, 342 S.E.2d 156, 160 (1986) (same). The basic principle is that insurance companies may not deceive insurance consumers into believing they have coverage only to have an exclusionary provision entirely nullify it.

■ An insurance company's duty to defend an insured is broader than the duty to indemnify under a liability insurance policy. An insurance company has a duty to defend an action against its insured if the claim stated in the underlying complaint could, without amendment, impose liability for risks the policy covers. If, however, the causes of action alleged in the plaintiff's complaint are entirely foreign to the risks covered by the insurance policy, then the insurance company

is relieved of its duties under the policy. "[I]ncluded in the consideration of whether [an] insurer has a duty to defend is whether the allegations in the complaint ... are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance polic[y]." Syllabus Point 3, in part, *Bruceton Bank v. United States Fidelity and Guaranty Insurance Co.*, 199 W.Va. 548, 486 S.E.2d 19 (1997). Thus, "[a]ny question concerning an insurer's duty to defend under an insurance policy must be construed liberally in favor of an insured where there is any question about an insurer's obligations." Syllabus Point 5, *Tackett v. American Motorists Ins. Co.*, 213 W.Va. 524, 584 S.E.2d 158 (2003).

Appellee Westfield argues that no "publication" occurred in the instant case because there is no allegation that Mr. Bowyer's statements were communicated to anyone other than the officers and employees of the appellant. Westfield asserts that the meaning of "publication" is clear and requires publication to a third person, and that there is no coverage afforded to the appellant in the instant case by the policy language. We disagree.

The Westfield policy contains no definition of the word "publication." We find nothing in the policy indicating that the word publication necessarily means transmitting the intercepted communications to a third party, as is required of material in the defamation context. And, even were we to assume publication does require communicating to a third-party, the surveillance monitoring system apparently functioned in such a way that anyone in the manager's office or in Mr. Hicks' home had the ability to listen in on employee conversations. Accordingly, we find that the policy language can reasonably be interpreted such that there would be coverage for the allegations in Mr. Bowyer's complaint, for the oral publication of material that violated his right of privacy.

Westfield directs our attention to two additional exclusions that were not considered by the circuit court in its order, but which West-

field asserts act to exclude Mr. Bowyer's lawsuit from coverage. First, Westfield points to an exclusion from coverage for any criminal act. The policy states:

This insurance does not apply to:

a. "Personal and advertising injury:"

\* \* \* \* \* \*

(4) Arising out of a criminal act committed by or at the direction of any insured[.]

Westfield argues that a violation of the Wiretapping and Electronic Surveillance Act is a felony, *see*, *W.Va.Code*, 62–1D–3(b),[9] and that there is therefore no coverage for the appellant's unlawful interception of Mr. Bowyers' conversations.

 It is well settled in this jurisdiction that "[a]n insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." Syllabus Point 7, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987). The appellee argues that most courts have held that a "criminal act" exclusion may apply only if it is proved that the insured acted with "criminal intent." We agree, and find no evidence in the record that the appellant acted with criminal intent in purchasing and using the surveillance system; instead, the appellant asserts that SSI told the appellant that the system was completely legal, and at trial the appellant introduced evidence in an attempt to show the system was purchased as a security system for patrons and employees. Further, criminal intent must be proven beyond a reasonable doubt, while a jury in a civil case need only apply a preponderance of the evidence test to find intent. On the existing record,

we cannot find any operative fact to support the operation of the criminal acts exclusion.

 The second exclusion asserted by Westfield excludes coverage for liability "arising out of any ... [e]mployment-related practices, policies, acts or omissions, such as coercion, ... harassment, humiliation or discrimination directed at that person[.]" We find nothing in the record to suggest that appellant Hi–Lad, Inc. made it a practice, or had a policy, or engaged in, acts of humiliation. In other words, while Mr. Bowyer contends he suffered humiliation as a result of the appellant's actions, there is nothing to indicate that the appellant's actions were intended to cause humiliation. Accordingly, we also find no operative fact to support this exclusion.

We therefore conclude that the circuit court erred in granting summary judgment to Westfield, and conclude that the appellant is entitled to coverage and a legal defense under the policy.

### D.

### *Third–Party Claims against SSI*

 The appellant argues that the circuit court erred in granting summary judgment to SSI, and thereby dismissing the appellant's claims for indemnification or contribution. Alternatively, the appellant argues that it should have been permitted to amend its third-party complaint to add new causes of action.

 The appellant contends that it has an implied indemnity claim against SSI for its actions in marketing a surveillance system that violated West Virginia law.[10] The elements of an implied indemnity claim are as follows:

---

**9.** *W.Va.Code*, 62–1D–3(b) states:
 Any person who violates subsection (a) of this section is guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary for not more than five years or fined not more than ten thousand dollars or both fined and imprisoned.

**10.** The appellant does not argue on appeal that the circuit court erred in dismissing its claim for

contribution, other than to conclusorily state that appellant is entitled "to have its indemnification and contribution claims remanded to the circuit court for resolution on the merits."

 However, we believe that the circuit court was correct in its determination. The plain language of the Act imposes civil liability upon the person who "intercepts, discloses, uses or procures any other person to intercept, disclose or use the

The requisite elements of an implied indemnity claim in West Virginia are a showing that: (1) an injury was sustained by a third party; (2) for which a putative indemnitee has become subject to liability because of a positive duty created by statute or common law, but whose independent actions did not contribute to the injury; and (3) for which a putative indemnitor should bear fault for causing because of the relationship the indemnitor and indemnitee share.

Syllabus Point 4, *Harvest Capital v. West Virginia Dept. of Energy*, 211 W.Va. 34, 560 S.E.2d 509 (2002). The appellant argues that appellee SSI, particularly in light of its actions in claiming that its surveillance system with hidden microphones was legal, should bear the brunt of the jury's verdict.

■ Appellee SSI, however, contends that the key to an indemnity claim—as the Court noted in *Harvest Capital*—is that the defendant seeking indemnification must show that its "independent actions did not contribute to the injury[.]" In other words, the defendant seeking indemnification must be one "who has committed no independent wrong." 211 W.Va. at 37, 560 S.E.2d at 512. SSI argues that the appellant chose to use the hidden microphones to intercept employee conversations in contravention of the Act, and has therefore committed an independent wrong. We agree, and conclude that the circuit court correctly determined that the appellant is not entitled to implied indemnification from SSI.

The appellant also asserts—as a matter of equity—that the Court should not permit SSI to use the language in the SSI sales contract requiring the appellant to indemnify SSI to avoid financial responsibility for Mr. Bowyer's lawsuit. That contractual language required the appellant to

> ... indemnify, hold [SSI] harmless from, and defend [SSI] against any and all claims, suits, proceedings, costs, expenses, damages and liabilities including its attor-

neys' fees, arising out of, connected with, or resulting from the Equipment ... including without limitation, the manufacture, selection, delivery, possession, use, operation or return of the Equipment.

The appellant contends that, as a matter of fairness, the circuit court should not have allowed this contract clause to control its actions, and should have permitted the appellant to amend its complaint to include a count for fraud and breach of warranty.

■ Appellee SSI argues, however, that the appellant was dilatory in asserting its claim for fraud. Further, the appellee argues that even if the appellant was successful in its claim, the end result would be that the appellee would exercise the indemnification clause to seek reimbursement from the appellant. In other words, the appellee argues that the futility of the appellant's claim justified the circuit court's actions. We agree.

We have held that

> [t]he liberality allowed in the amendment of pleadings does not entitle a party to be dilatory in asserting claims or to neglect his case for a long period of time.... Lack of diligence is justification for a denial of leave to amend where the delay is unreasonable, and places the burden on the moving party to demonstrate some valid reason for his neglect and delay.

*Mauck v. City of Martinsburg*, 178 W.Va. 93, 95, 357 S.E.2d 775, 777 (1987). The original complaint in this action was filed by Mr. Bowyer in August 2000, but the appellant waited until March 2002 to file the original third-party complaint against appellee SSI. After SSI filed its motion for summary judgment in June 2002, in August 2002 the appellant moved to amend its complaint. The circuit court was within its discretion to find that the appellant had been dilatory in seeking this amendment. Further, the circuit court was within its discretion to find that the third-party complaint and its amendment would have been futile because of the opera-

communications[.]" *W.Va.Code,* 62–1D–12. It does not impose liability upon the manufacturer

of equipment that is used by the person to violate the Act.

tion of the indemnification clause.[11]

We therefore find no error in the circuit court's decision to grant summary judgment to appellee SSI, and to dismiss all claims contained in the appellant's third-party complaint.

## IV.

The circuit court's judgment order dated April 11, 2003, and its May 30, 2003 decision to deny appellant Hi–Lad, Inc.'s motions for judgment or a new trial are affirmed. The circuit court's October 1, 2002 order granting summary judgment to SSI is also affirmed.

However, the circuit court's September 5, 2001 order declaring that appellee Westfield had no duty to indemnify or defend the appellant is reversed, and the case is remanded to the circuit court for further proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part, and remanded.

Chief Justice MAYNARD dissents and reserves the right to file a dissenting opinion.

Justice DAVIS dissents and reserves the right to file a dissenting opinion.

DAVIS, Justice, dissenting, joined by Chief Justice Maynard:

In this case the majority affirmed a jury verdict for the plaintiff, Mr. Bowyer, on the grounds that he had established by a preponderance of the evidence that his employer, the defendant, recorded conversations by him in violation of the West Virginia Wiretapping and Electronic Surveillance Act, W. Va.Code § 62–1D–1, et seq. I dissent on two separate grounds. First, the majority's determination that the jury verdict was supported by circumstantial evidence is simply wrong in view of the fact that not a scintilla of evidence was introduced to sustain the

verdict. Second, under the facts presented in this case, it is clear that Mr. Bowyer lacked standing to assert a claim alleging a violation of the West Virginia Wiretapping and Electronic Surveillance Act. Accordingly, I respectfully dissent.

### A. The Law of Circumstantial Evidence Has Limitations

In affirming the jury verdict in the instant case, the majority opinion concluded that there was "sufficient *circumstantial* evidence that the jury could conclude the [defendant] acquired the contents of Mr. Bowyer's oral communications through the use of an electronic device." Majority Slip. op. at 10. I disagree.

The law in this State is clear in holding that "[a]lthough mere speculation will not sustain the plaintiffs' burden of proof, both direct and circumstantial evidence can be used[.]" *Cale v. Napier,* 186 W.Va. 244, 247, 412 S.E.2d 242, 245 (1991). We have further explained that " '[c]ircumstantial evidence is adequate as proof if its quality is such that the jury believes that the greater probability of truth lies therein.' " *Anderson v. Chrysler Corp.,* 184 W.Va. 641, 647, 403 S.E.2d 189, 195 (1991) (quoting *Vernon v. Lake Motors,* 26 Utah 2d 269, 488 P.2d 302, 306 (1971)). However, circumstantial evidence is " 'not sufficient when the conclusion in question is based on surmise, speculation or conjecture.' " *Willey v. Riley,* 541 N.W.2d 521, 527 (Iowa 1995) (quoting 32A C.J.S. *Evidence* § 1039, at 753–54 (1964)). *See also Lacy v. CSX Transp. Inc.,* 205 W.Va. 630, 642, 520 S.E.2d 418, 430 (1999) (" 'A jury will not be permitted to base its findings of fact upon conjecture or speculation.' " (quoting Syl. pt.1, *Oates v. Continental Ins. Co.,* 137 W.Va. 501, 72 S.E.2d 886 (1952))). The court in *Summers v. Fort Crockett Hotel, Ltd.,* 902 S.W.2d 20 (Tex.App.1995), succinctly addressed the limitations of circumstantial evidence to prove a legal theory as follows:

An ultimate fact may be established by circumstantial evidence, but the circum-

---

11. We note that the appellant does not challenge the circuit court's determination that "the causes of action set forth [in the amended third-party complaint] may be time-barred pursuant to the statute of limitations applicable to claims for fraud and/or negligence, *see* W.Va Code § 55–7–8a[.]"

stances relied upon must have probative force sufficient to constitute a basis of legal inference. It is not enough that the facts raise a mere surmise or suspicion of the existence of the fact or permit a purely speculative conclusion. The circumstances relied on must be of such a character as to be reasonably satisfactory and convincing, and must not be equally consistent with the non-existence of the ultimate fact.

*Summers*, 902 S.W.2d at 25.

In the instant case, Mr. Bowyer was required to put on evidence that demonstrated the defendant had recorded his conversations in violation of the West Virginia Wiretapping and Electronic Surveillance Act. However, Mr. Bowyer failed to produce *any* evidence that the defendant actually recorded or videotaped a single conversation in which he had participated. Instead, the totality of Mr. Bowyer's evidence in this respect consisted of ʻ four hours of both video and audio interceptions of [other] hotel employees and members of the public speaking in the vicinity of the hotel's front desk and the hotel bar." The majority's conclusion that this was sufficient circumstantial evidence upon which the jury could properly find that the defendant recorded Mr. Bowyer's conversations is simply untenable.

Moreover, the evidence presented by Mr. Bowyer is a classic example of the type of circumstantial evidence that compels a jury to engage in improper gross speculation. Under the decision by the majority, the traditional limitations imposed upon the use of circumstantial evidence have now been removed. In essence, the majority opinion permits circumstantial evidence to encompass any evidence that allows a jury to speculate in reaching its conclusion. This definition of circumstantial evidence directly contradicts this Court's prior precedent in this regard, and, therefore, I dissent.

### B. Mr. Bowyer Lacked Standing

This Court has previously indicated that "standing is defined as ʻ[a] party's right to make a legal claim or seek judicial enforce-ment of a duty or right.'" *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 94, 576 S.E.2d 807, 821 (2002) (quoting Black's Law Dictionary 1413 (7th ed.1999)). Ultimately, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975). Further, "[s]tanding is a jurisdictional requirement that cannot be waived, and may be brought up at any time in a proceeding." Franklin D. Cleckley, Robin J. Davis & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 12(b), at 21 (Supp.2004).

> The decisions of this Court and other jurisdictions have pointed out that an appellate court has the inherent authority and duty to *sua sponte* address the issue of standing, even when the parties have failed to raise the issue at the trial court level or during a proceeding before the appellate court.

*State ex rel. Abraham Linc Corp. v. Bedell*, 216 W.Va. 99, 111, 602 S.E.2d 542, 554 (2004) (Davis, J., concurring). In the instant case, the parties did not raise the issue of standing; however, in view of the evidence presented during the trial, this Court had a duty to *sua sponte* address the issue.

In my concurring opinion in *Bedell*, I noted the following regarding the issue of standing:

> The decisions of this Court have recognized two types of standing inquiries. First, the issue of standing may be presented in the context of a litigant asserting an alleged right that is unique to him or her. This is known "as first party standing[.]" *Romano v. Harrington*, 664 F.Supp. 675, 679 (E.D.N.Y.1987). In this specific context, we articulated the elements for establishing standing in syllabus point 5 of *Findley* as follows:
>
> > Standing is comprised of three elements: First, the party attempting to establish standing must have suffered an "injury-in-fact"—an invasion of a legally protected interest which is (a) concrete

and particularized and (b) actual or imminent and not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct forming the basis of the lawsuit. Third, it must be likely that the injury will be redressed through a favorable decision of the court.

The second context in which standing may be analyzed occurs when a litigant seeks to assert the rights of a third party. This standing issue "is also commonly known as jus tertii standing." *Pennsylvania Psych. Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 287 n. 7 (3d Cir.2002). In this situation "[i]t is a well-established rule that a litigant may assert only his own legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties." *Coalition of Clergy, Lawyers, and Professors v. Bush*, 310 F.3d 1153, 1163 (9th Cir.2002). We have previously noted that

> [t]raditionally, courts have been reluctant to allow persons to claim standing to vindicate the rights of a third party on the grounds that third parties are generally the most effective advocates of their own rights and that such litigation will result in an unnecessary adjudication of rights which the holder either does not wish to assert or will be able to enjoy regardless of the outcome of the case.

*Snyder v. Callaghan*, 168 W.Va. 265, 279, 284 S.E.2d 241, 250 (1981) (citation omitted).

216 W.Va. at 112-13, 602 S.E.2d at 555-56 (Davis, J., concurring). Finally, in order to establish *jus tertii* standing, "[t]he litigant must have suffered an injury in fact . . .; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 1370-71, 113 L.Ed.2d 411, 425 (1991) (internal quotations and citations omitted).

In the instant proceeding, the record overwhelmingly demonstrated that Mr. Bowyer had neither first party nor *jus tertii* standing in this case. Under both standing principles, Mr. Bowyer had to establish that he suffered an injury-in-fact. However, Mr. Bowyer's evidence established only that the defendant may have violated the West Virginia Wiretapping and Electronic Surveillance Act by recording conversations of people other than himself. This possible injury-in-fact to other people simply cannot be used by Mr. Bowyer to establish first party standing or *jus tertii* standing. Consequently, the verdict in this case should have been reversed and the case dismissed on the grounds that Mr. Bowyer's evidence failed to establish that he had standing to bring the complaint.

For the reasons stated, I dissent. I am authorized to state that Chief Justice Maynard joins me in this dissenting opinion.