624 S.E.2d 738

**In re TOBACCO LITIGATION
(Personal Injury Cases).**

**No. 32552.**

Supreme Court of Appeals of West Virginia.

Submitted: Sept. 20, 2005.

Filed: Dec. 2, 2005.

Cindy J. Kiblinger, Esq., James F. Humphreys & Associates, Timothy N. Barber, Esq., Charleston, Kenneth B. McClain, Esq., Scott B. Hall, Esq., Humphrey, Farrington & McClain, Independence, MO, for Plaintiffs.

Andrew Shapiro, Esq., Mayer, Brown, Rowe & Maw, Chicago, IL, for Defendants.

W. Henry Jernigan, Jr., Esq., Brace R. Mullett, Esq., Dinsmore & Shohl, Charleston, for R.J. Reynolds Tobacco Company and Brown & Williamson Holdings, Inc.

Michael J. Farrell, Esq., Joseph M. Farrell, Jr., Esq., Farrell, Farrell & Farrell, Huntington, for Lorillard Tobacco Company.

David B. Thomas, Esq., Pamela L. Campbell, Esq., Teresa K. Thompson, Esq., Allen Guthrie McHugh & Thomas, Charleston, for Philip Morris USA, Inc. and Defendants' Liaison Counsel.

Richard E. Rowe, Esq., J. David Fenwick, Esq., Goodwin & Goodwin, Charleston, for British American Tobacco (Investments) Limited f/k/a British–American Tobacco Company Limited.

Thomas V. Flaherty, Esq., Andrew B. Cooke, Esq., Flaherty, Sensabaugh & Bonasso, Charleston, for B.A.T. Industries p.l.c.

Shawn P. George, Esq., George & Lorensen, Charleston, for Hill and Knowlton, Inc.

Stephen B. Farmer, Esq., G. Kenneth Robertson, Esq., Farmer, Cline & Campbell, for Amici Curiae Certain Asbestos Defendants.

Justice MAYNARD delivered the Opinion of the Court.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

Justice BENJAMIN concurs and reserves the right to file a concurring opinion.

MAYNARD, Justice.

This case concerns the following certified question from the Circuit Court of Ohio County:

> Does the Due Process Clause of the Fourteenth Amendment to the Federal Constitution, as interpreted by *State Farm v. Campbell,* preclude a bifurcated trial plan in a consolidated action consisting of personal injury claims of approximately 1,000 individual smokers, wherein Phase I of the trial would decide certain elements of liability and a punitive damages multiplier and Phase II of the trial would decide for each plaintiff compensatory damages and punitive damages based upon the punitive damages multiplier determined in Phase I?

For the reasons that follow, we answer the certified question in the negative.

## I.

### FACTS

On September 28, 1999, then Chief Justice Larry Starcher entered an administrative order, pursuant to Rule 26 of the West Virginia Trial Court Rules for Trial Courts of Record, consolidating and transferring all similar tobacco litigation pending at that time to the Circuit Court of Ohio County with Judge Arthur M. Recht, a member of the Mass Litigation Panel, presiding. According to the parties, the litigation now includes approximately 1,100 individual plaintiffs' claims.

■ On January 11, 2000, the circuit court entered a "Case Management Order/Trial Plan"[1] that ordered the consolidation of all

---

1. This Court has recognized that trial courts have significant leeway in implementing a mass trial

pending personal injury tobacco cases in a single consolidated trial, with the trial issues to be bifurcated as follows:

(a) Phase I—General liability issues common to all defendants including, if appropriate, defective product theory; negligence theory; warranty theory; and any other theories supported by pretrial development.

Also to be tried in Phase I will be entitlement to punitive damages[.]

(b) Phase II—Individual claims of the plaintiffs whose cases have been consolidated. Either separate individual juries, judge or judges will independently address issues unique to each plaintiff's compensatory damages and any other individual issues in reasonably sized trial groups or on an individual basis.

The defendant tobacco companies ultimately moved to revise this trial plan by removing the issue of the entitlement to and, if appropriate, the amount of punitive damages from the jury's consideration in Phase I of the trial based on the U.S. Supreme Court case of *State Farm v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). By order of June 16, 2004, the circuit court vacated and set aside the January 11, 2000, trial plan order. The circuit court found that *Campbell* stands for the principle that the conduct of a party against whom punitive damages are sought must have a direct nexus to a specific person who claims to have been damaged by that conduct. The circuit court further found that "[t]he emphasis upon a subjective analysis of the defendant's conduct vis-a-vis a specific plaintiff requires that the defendant's conduct be tailored to each plaintiff[,]" and concluded that this could not be accomplished under the existing trial plan order. The circuit court certified the question set forth above to this Court in a Sep-

tember 24, 2004, order and answered the question in the affirmative.

## STANDARD OF REVIEW

■ "The appellate standard of review of questions of law answered and certified by a circuit court is *de novo*." Syllabus Point 1, *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996).

## III.

## DISCUSSION

The issue before is whether the United States Supreme Court's decision in *State Farm v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) precludes bifurcation as originally ordered by the circuit court wherein the punitive damages multiplier would be determined prior to the assessment of compensatory damages for each plaintiff.

■ The plaintiffs below support the circuit court's vacated trial plan. They assert that the plan did not violate *Campbell*, which, they allege, is not a fundamental change of long-standing punitive damages law but rather is perfectly consistent with such law. The defendant tobacco companies, on the other hand, challenge the circuit court's trial plan essentially on the basis that it violates *Campbell* by permitting the plaintiffs to show the reprehensibility of the defendants' conduct,[2] for the purpose of proving the appropriateness of punitive damages, by admitting evidence of conduct that was dissimilar to the conduct that injured particular plaintiffs. The defendants assert that evidence of prior bad conduct must be related to the defendant's actions toward individual plaintiffs in

---

format. *State ex rel. Mobil Corp. v. Gaughan*, 211 W.Va. 106, 563 S.E.2d 419 (2002), *cert denied, Mobil Corp. v. Adkins*, 537 U.S. 944, 123 S.Ct. 346, 154 L.Ed.2d 252 (2002). In Syllabus Point 3 of *State ex rel. Appalachian Power Co. v. MacQueen*, 198 W.Va. 1, 479 S.E.2d 300 (1996), we held:

A creative, innovative trial management plan developed by a trial court which is designed to achieve an orderly, reasonably swift and efficient disposition of mass liability cases will be approved so long as the plan does not trespass

upon the procedural due process rights of the parties.

2. In *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), this Court held that the jury may consider the reprehensibility of the defendant's conduct including whether and how often the defendant engaged in similar conduct in the past. We believe that *Campbell* does not materially alter this holding. Rather, *Campbell* generally addresses the requirement that evidence of prior bad conduct must be "similar."

order to be relevant to the punitive damages analysis.

In *Campbell*, the insureds brought an action against their insurer, State Farm, to recover for bad-faith failure to settle within the policy limits and damages for fraud and intentional infliction of emotional distress. A jury awarded the insureds $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million respectively. On appeal, the Utah Supreme Court reinstated the $145 million punitive damages award. The United States Supreme Court subsequently reversed the punitive damages award because it found it to be "neither reasonable nor proportionate to the wrong committed," and "an irrational and arbitrary deprivation of the property of the defendant" in violation of the Fourteenth Amendment. *Campbell*, 538 U.S. at 429, 123 S.Ct. at 1526. The Court explained that the insureds' attempt to show the reprehensible conduct of State Farm by introducing evidence of State Farm's business practices for over 20 years in numerous states was constitutionally improper. According to the Court:

> The [insureds] have identified scant evidence of repeated misconduct of the sort that injured them. Nor does our review of the Utah courts' decisions convince us that State Farm was only punished for its actions toward the [insureds]. Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees. The [insureds'] attempt to justify the courts' reliance upon this unrelated testimony on the theory that each dollar of profit made by underpaying a third-party claimant is the same as a dollar made by underpaying a first-party one. For the reasons already stated, this argument is unconvincing. The reprehensibility guide-

post does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20–year period. In this case, because the [insureds] have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.

538 U.S. at 423–24, 123 S.Ct. at 1523–24 (citations omitted).

After carefully considering the parties' arguments and the Supreme Court's decision in *Campbell*, this Court finds that *Campbell*, which did not involve mass tort litigation, does not per se preclude the circuit court's original trial plan. We emphasize that the question before this Court is a narrow one. Accordingly, our answer is strictly limited to this narrow question. Our response is limited to the issue of whether *State Farm v. Campbell* precludes a bifurcated trial plan like the one below. Further, we do not address whether there may be other legal reasons to question the circuit court's bifurcated trial plan. Nor do we, or indeed can we, address in the abstract the specific evidence that may be presented on the issue of reprehensibility. Our conclusion in this case simply is, first, we find nothing in *Campbell* that mandates a reexamination of our existing system of mass tort litigation. Second, we find nothing in *Campbell* that per se precludes a bifurcated trial plan in which a punitive damages multiplier is established prior to the determination of individual compensatory damages. Beyond this, we leave more specific issues for another day. As this Court stated in *State ex rel. Mobil Corp. v. Gaughan*, 211 W.Va. 106, 563 S.E.2d 419 (2002),

> we cannot substantively address Mobil's concerns regarding the potential use of a matrix, or a punitive damage multiplier, because the trial court has not yet definitively ruled upon the use of either of these mechanisms. Accordingly, any consideration of these issues at this time would be clearly premature. The trial court's announcement to postpone for the time being, any decision regarding the potential use of a matrix underscores the precipitous

nature of ruling on this issue at this juncture. Matters such as a matrix and the use of a punitive damage multiplier, given the unresolved nature of the use of such mechanisms, can be better addressed by this Court upon appeals taken from final orders.

*Gaughan*, 211 W.Va. at 116, 563 S.E.2d at 426. Similarly, in the instant case, any issue beyond that set forth in the certified question is one that this Court will only consider on appeal with the benefit of a fully developed record and a final order. To reiterate, it is clear to this Court that *Campbell* does not eliminate mass tort litigation as provided for in our Trial Court Rule 26. Further, it is significant to us that bifurcated trial plans structured like the one at issue are common in West Virginia as well as other jurisdictions. In sum, absent a clear indication to the contrary, we believe that *Campbell* does not preclude the bifurcated trial plan at issue.

The circuit court found in its order setting aside its original trial plan, and the defendants agree, that "the conduct of a party against whom punitive damages are sought must have a direct nexus to a specific person who claims to have been damaged by that conduct." Further, "[t]he emphasis upon a subjective analysis of the defendant's conduct vis-a-vis a specific plaintiff requires that the defendant's conduct be tailored to each plaintiff. That cannot be accomplished under the existing Case Management Order." We reject the circuit court's application of *Campbell*.

*Campbell* stands for the principle, among others, that "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." 538 U.S. at 422–23, 123 S.Ct. at 1523. Notably, the facts in *Campbell* were quite extreme. As noted above, the plaintiffs in *Campbell* brought what the Supreme Court characterized as a third-party bad faith claim against their insurer. In order to show the reprehensibility of the insurer's conduct, the plaintiffs were permitted to introduce evidence of insurer misconduct that had nothing to do with the

type of misconduct that injured them. "For example, the Utah Supreme Court [in upholding the verdict in *Campbell*] criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees." *Campbell*, 538 U.S. at 424, 123 S.Ct. at 1523.

In application of this principle to the instant case, it is the role of the circuit court to ensure that the plaintiffs' evidence is relevant, reasonably related to the acts upon which liability is premised, and supports their claim for punitive damages. Therefore, we find nothing in the circuit court's original trial plan that prevents the admission of evidence that is proper under *Campbell*.

Another concern raised by the defendants is that the circuit court's original trial plan would not ensure that punitive damages are proportionate to the injury caused to individual plaintiffs. Again, we disagree. As noted above, the circuit court's original trial plan anticipates that the defendants' general liability and a punitive damages multiplier would be determined in the first trial phase. In the second phase, compensatory damages would be determined for each individual plaintiff after individual evidence is presented. Finally, the punitive damages multiplier determined in the first phase would be applied to each plaintiff's compensatory damages award in order to reach the proper amount of punitive damages for each plaintiff.

Concerning the proper ratio of punitive damages to compensatory damages, the Court in *Campbell* opined,

we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mut. Life Ins. Co. v.] Haslip*, [499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1

(1991)] in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. We cited that 4-to-1 ratio again in [*BMW of North America, Inc. v.] Gore*, [517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)]. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing that sanctions of double, treble, or quadruple damages to deter and punish. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goal of deterrence and retribution, than awards with ratios in range of 500 to 1, or, in this case, 145 to 1.

*Campbell*, 538 U.S. at 424–425, 123 S.Ct. at 1524 (citations omitted). The defendants below contend that by determining the punitive damages multiplier prior to determining individual compensatory damages, there is no way to ensure the proper ratio between the two. We disagree.

█ This Court has recognized the duty of trial courts to review punitive damage awards. *See Bowyer v. Hi–Lad, Inc.* 216 W.Va. 634, 649, 609 S.E.2d 895, 910 (2004) (stating that "[i]f a jury awards punitive damages to a litigant, a circuit court must carefully review the jury's verdict"); *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991) (setting forth the factors for trial courts to consider when reviewing awards of punitive damages). In cases like the instant one, we are confident that once individual compensatory and punitive damages awards are determined, the trial court can review each of the awards to ensure that it comports with the principles articulated in *Campbell* and other applicable cases.[3]

█ Therefore, we now hold that the United States Supreme Court's decision in *State Farm v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), does not preclude the bifurcation of a trial into two phas-

es wherein certain elements of liability and a punitive damages multiplier are determined in the first phase and compensatory damages and punitive damages, based on the punitive damages multiplier, are determined for each individual plaintiff in the second phase.

Again, in answering the question certified to us, we have determined merely that the trial court's original trial plan is not violative of *Campbell*. Beyond this, we make no judgment on whether the trial court's original plan is the best method for trying the instant tobacco litigation. Further, we decline to tell the circuit court how to proceed. This Court has recognized that,

> management of [mass tort] cases cannot be accomplished without granting the trial courts assigned to these matters significant flexibility and leeway with regard to their handling of these cases. A critical component of that required flexibility is the opportunity for the trial court to continually reassess and evaluate what is required to advance the needs and rights of the parties within the constraints of the judicial system. Out of this need to deal with "mass litigation" cases in non-traditional and often innovative ways, TCR 26.01 was drafted and adopted.

*State ex rel. Mobil Corp. v. Gaughan*, 211 W.Va. 106, 111, 563 S.E.2d 419, 424 (2002). Thus, absolutely nothing in this opinion should be read to limit a trial court's significant leeway in fashioning a trial plan appropriate to the specific circumstances of the mass tort case at issue.

## IV.

## CONCLUSION

For the reasons set forth above, we answer the certified question as follows:

> Does the Due Process Clause of the Fourteenth Amendment to the Federal Constitution, as interpreted by *State Farm v. Campbell*, preclude a bifurcated trial plan in a consolidated action consisting of personal injury claims of approximately 1,000 individual smokers, wherein Phase I of the trial would decide certain elements

---

**3.** Punitive damages awards should also be assessed by the trial court in light of this Court's holdings in *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870

(1992), *affirmed*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), and *Garnes, supra*, and the holding of the United States Supreme Court in *BMW of North America, Inc. v. Gore, supra*.

of liability and a punitive damages multiplier and Phase II of the trial would decide for each plaintiff compensatory damages and punitive damages based upon the punitive damages multiplier determined in Phase I?

Answer: No.

Certified question answered.

STARCHER, J., concurring.

I write separately to explain the "mass litigation" system that underlies the majority's opinion, and to state why such a system is necessary. I also write to explain why the method chosen by the circuit court to assess punitive damages in this case is constitutional under the federal and state due process clauses.

The instant case represents a trial judge struggling to do precisely what the *Rules of Civil Procedure* and the *Trial Court Rules* told him to do: to do whatever was necessary "to secure the just, speedy, and inexpensive determination of every action." *W.Va.R.Civ. Pro.* Rule 1 [1998]. The defendants, however, contend that a speedy and inexpensive resolution of the question regarding whether they should be subject to punitive damages, for allegedly knowingly marketing a defective product, is contrary to their due process rights under the state and federal *Constitutions.* The defendants assert that the trial court is constitutionally mandated to deny the plaintiffs a just, speedy and inexpensive resolution of their claims in order that the defendants' property rights may be fully protected.

The majority opinion properly rejects this ridiculous position. The defendants are certainly entitled to due process. But exactly what process is due is entirely dependent upon the trial judge's discretion, and the trial judge's duty to afford *all* parties due process.

In the current age, a single mistake by a product manufacturer can injure dozens, hundreds, or even thousands upon thousands of individuals. A few manufacturers take a callous, deliberate, and knowing approach and choose to ignore the injuries caused by their products, or conspire to conceal the problems with their products. Sometimes, the injuries caused by the product cover the nation and span many decades.

The classic example is asbestos. Asbestos is a rock, a wonderful, flexible, fibrous material that is mined from the ground and which gives strength and fire resistance to products. Unfortunately, asbestos is one of the most toxic substances known to the human body. When inhaled over a period of time, it can cause the lungs to form scar tissue that grows and fills the lungs decades after exposure to asbestos stops. Even when inhaled into the lungs in minute quantities, it can cause cancer.

Companies that used asbestos in their products first started learning about asbestos-related diseases in the 1910s and 1920s. But rather than warn the public not to breathe asbestos dust, or stop mixing asbestos into their products, the companies plowed ahead and concealed the dangers. It was not until the 1970s that the government finally took action to prevent the use of asbestos, and required companies to put warnings on their products that breathing asbestos dust was hazardous.

The plaintiffs who filed lawsuits for their asbestos-related injuries did not sue the defendants because the products contained asbestos. Instead, the lawsuits focused on the fact that the products did not bear labels warning the product's users of the dangers of inhaling asbestos fibers. In other words, these were "failure to warn" product defect cases. West Virginia, with its many chemical and power plants, has many thousands of citizens who were exposed to asbestos dust from the use of asbestos-containing products in the 1940s through the 1980s. As a result, many citizens have developed (or are even just now developing) lung diseases and cancers directly related to asbestos.

Plaintiffs filed lawsuits in counties across West Virginia. First there were a few cases in State court, then a few dozen, then hundreds, then thousands.[1] Circuit courts start-

---

1. *See, e.g., State ex rel. H.K. Porter Co., Inc. v. White,* 182 W.Va. 97, 100, 386 S.E.2d 25, 28 (1989) ("There are presently 114 asbestos-related personal injury actions pending before the respondent Judge White in the Circuit Court of Pleasants County. Of more immediate concern to the petitioner in this case, however, are ten (10) consolidated cases set for trial on October 23, 1989."); *Cline v. White,* 183 W.Va. 43, 47 n.

ed to try the cases one at a time, but quickly abandoned that route; trying each case individually would have required hundreds of years. The same lawyers and the same witnesses were employed, using the same documents and evidentiary exhibits, on a full-time basis in counties throughout the State.[2] Every trial involved weeks of testimony to try the same issues about the same defendants again and again and again. Virtually everything pertaining to the defendants remained the same. The only issues that changed concerned the plaintiffs, namely the existence and degree of each plaintiff's injury and damages, which defendants' products caused the injury, and the relative fault of each defendant for the plaintiff's damages.

This Court recognized that special procedures were required to address this judicial administrative nightmare, and the current "mass litigation" system grew into being.

Starting in the late 1980s, a handful of circuit judges—myself included—were specially trained in handling complex, "toxic tort" litigation. Using its constitutional administrative authority, the Court transferred asbestos cases from throughout the State to a handful of counties for these specially-trained circuit judges to resolve. Once the asbestos cases were before a single judge, the judge used the authority provided by Rule 42(a) of the *Rules of Civil Procedure* [1998] to manage the case. Rule 42 provides, in part:

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay....

Initially, instead of trying cases individually, cases with a common theme were grouped together for trial. The plaintiffs' cases were first placed in groups of twenty or thirty for trial. Usually, the plaintiffs all worked for the same employer or at the same work site, around the same time periods, and were therefore usually injured by the same defendants' products.

But when the numbers of cases began to reach into the thousands, judges adjusted their approach. Several thousand cases were "massed" together into one proceeding, and through the use of Rule 42, the cases were broken down into various sub-proceedings with common issues of law or fact for separate trials.

In run-of-the-mill litigation this Court has indicated that bifurcation of a case into mini-trials is generally disfavored. As we stated in Syllabus Point 4 of *Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 209 W.Va. 318, 547 S.E.2d 256 (2001):

> West Virginia jurisprudence favors the consideration, in a unitary trial, of all

---

2, 393 S.E.2d 923, 927 n. 2 (1990) ("According to records kept by the administrative office of the Court, as of March 26, 1990, there were 1,605 asbestos claims pending in West Virginia.").

**2.** For instance, in *State ex rel. H.K. Porter Co., Inc. v. White*, 182 W.Va. 97, 386 S.E.2d 25 (1989), the Court related the following circumstances about one lawyer representing one defendant that manufactured asbestos-containing products:

> ... H.K. Porter Company, Inc. has been a named defendant in approximately fifteen hundred (1,500) asbestos-related personal injury lawsuits throughout West Virginia, as well as *sixty thousand (60,000) similar lawsuits* throughout the United States. Since 1981, H.K. Porter Company, Inc. has been represented by the Auburn, Maine, law firm of Skelton, Taintor and Abbott. Steven F. Wright has served as Skelton, Taintor and Abbott's lead counsel in asbestos litigation since 1985, and, as a result, he has appeared in numerous state and federal jurisdictions in the United States.

In October, 1988, Mr. Wright was retained to represent H.K. Porter Company, Inc. on a regional basis and he became responsible for case disposition in Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, Puerto Rico, the Virgin Islands, and West Virginia. The petitioners state that H.K. Porter Company, Inc. "relies upon Attorney Wright as the attorney to whom it has given ultimate responsibility for settlement or trial of asbestos cases in West Virginia consistent with its national policies and procedures for defending such cases."

182 W.Va. at 99–100, 386 S.E.2d at 27–28. The Court further noted that the attorney had appeared in 1,500 asbestos-related personal injury actions in West Virginia in twenty-four months, and that "Mr. Wright included a list of his appearances at six trials in West Virginia from 1987 to 1989 on behalf of the H.K. Porter Company, Inc." 182 W.Va. at 100 n. 4, 386 S.E.2d at 28 n. 4.

claims regarding liability and damages arising out of the same transaction, occurrence or nucleus of operative facts, and the joinder in such trial of all parties who may be responsible for the relief that is sought in the litigation.

However, in mass litigation cases, we have given trial judges substantial leeway to craft the procedures necessary to avoid unnecessary costs or delay. Asbestos cases continued be litigated as thousands of individual personal-injury claims against dozens of asbestos-using manufacturers were filed. The process for managing this litigation continued to change gradually. For example, by using Rule 42(a), judges began to bifurcate the asbestos cases into two separate proceedings. The first proceeding involved questions of law and fact that were common as to the defendants; the second proceeding involved questions common to the plaintiffs.

In the first proceeding, often called the "liability phase," one jury would see evidence regarding common questions of law and fact pertaining to the defendants.[3] Experts would testify about the uses of asbestos, the diseases caused by asbestos, and would show the jury decades-old documents and discuss what the various defendants knew about the dangers of asbestos and when. The primary question for the jury to consider was this: considering the state-of-the-art knowledge of manufacturing in the 1940s, 1950s, 1960s, or 1970s, did each defendant manufacture a product that was defective because it failed to come with an adequate warning about the dangers of inhaling asbestos fibers?

With this first phase of the proceeding, the plaintiffs and the defendants avoided thousands of days of courtroom work in individual trials. The same lawyers were not required to use the same witnesses to repeatedly retry the same questions. By trying those questions once for all the plaintiffs, Rule 42(a) permitted a court to avoid "unnecessary costs or delay"—for both plaintiffs and defendants.

A corollary question addressed by the jury in the first proceeding concerned punitive damages. If the defendant actually knew about the dangers of asbestos in the 1940s, 1950s, 1960s, or 1970s—and many did—then the jury was asked a second question: did the defendant callously, deliberately or greedily fail to warn the public of those dangers, and if so should the defendant be punished for its actions?

Many of the same witnesses and documents used to prove that the product was defective were also used to prove an entitlement to punitive damages. Both issues overlap and involve the actual knowledge of the defendant. If the defendant knew the product was inherently dangerous for its intended use, the product was defective. Likewise, if the defendant knew that the product was inherently dangerous for its intended use, and knew that the product was causing harm to individuals, and the defendant recklessly or deliberately kept marketing the defective product—well, that's grounds for punitive damages.

Juries in the first proceeding could easily determine, yes or no, whether punitive damages should be assessed against a defendant. The problem in the first proceeding was with fixing the actual dollar amount of punitive damages. Since the first phase jury knew nothing of the degree of injury or specific financial circumstances of each of the thousands of plaintiffs, the jury could not knowledgeably determine what dollar amount of punitive damages would be fair for each plaintiff.

It is axiomatic that punitive damages must bear a "reasonable relationship" to the potential of harm caused by the defendant's actions. Syllabus Point 1, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991). To meet this reasonable relationship requirement, we indicated in Syllabus Point 3 of *Garnes* that juries must be instructed using the following language:

---

**3.** Actually, at times there was more than one jury. When the numbers of defendants in a single trial became unmanageable, the defendant manufacturers were divided into different courtrooms with different juries. The defendants were grouped with other defendants with similar characteristics (for instance, asbestos-using gask-

et makers or glove manufacturers). The juries were brought together into one courtroom to hear evidence common to all defendants—like scientific evidence about the types of injuries caused by asbestos—and separated to hear evidence unique to each defendant.

Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

Judges dealing with asbestos cases determined that the mandate of *Garnes* could be met by letting the jury in the first phase assess a "punitive damage multiplier." The jury was asked to calculate a multiplier such that the final dollar amount of punitive damages paid by the defendant would bear a reasonable relationship to the harm that was likely to occur from the defendant's conduct as well as the harm that actually occurred. The punitive damage multiplier would be used in the second phase to multiply the amount of the plaintiff's compensatory damages to actually determine the dollar amount of the defendant's punitive damage liability.

In the second phase proceeding, questions of law and fact common to the plaintiffs would be resolved. The plaintiffs' cases would be broken down—into groups by the plaintiff's asbestos-related disease or by the plaintiff's work place, or even individually— and juries would hear evidence unique to each plaintiff. For instance, medical experts would discuss whether or not the plaintiff had an injury, and whether that injury was caused by asbestos. Economic experts would discuss the plaintiff's loss. Other experts would present evidence concerning the particular asbestos products that caused the plaintiff's injuries.

The second, "individual issues" or "damage phase" trials would begin with a brief statement to the jury by the lawyers about what happened in the first, "liability phase" trial. The juries would be instructed by the judge that the defendant's product was defective; the jury would only be charged with sorting out whether the defendant's product caused the plaintiff's injury, and the amount of the plaintiff's compensatory damages.

After the trial was complete, the judge would take the punitive damages multiplier determined in the first trial, multiply the plaintiff's compensatory damages by that multiplier, and thereby know the dollar amount of the punitive damages due and owing to the plaintiff. Furthermore, the judge would then conduct a post-trial review of the punitive damages award to ensure that the award was constitutionally fair and reasonably related to the harm that the defendant caused and could have caused to the plaintiff.[4]

By the mid–1990s, this Court recognized that other individual personal-injury actions with characteristics similar to asbestos were being filed. The Court therefore took steps to codify the procedures that evolved in the context of asbestos litigation.

In 1999, the Court adopted Trial Court Rule 26.01, formalizing the "mass litigation" system. Rule 26.01 created a "Mass Litigation Panel" consisting of six judges, and empowered the Panel to resolve any "mass litigation" case that the Chief Justice of this Court referred to the panel.[5] Essentially,

---

4. As we stated in Syllabus Point 4 of *Garnes*:

When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

(1) The costs of the litigation;

(2) Any criminal sanctions imposed on the defendant for his conduct;

(3) Any other civil actions against the same defendant, based on the same conduct; and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.

5. Rule 26.01(c) defines "mass litigation" thusly:

"Mass litigation" shall be defined as two (2) or more civil actions pending in one or more circuit courts: (a) involving common questions of law or fact in mass accidents or single catastrophic events in which a number of people are injured; or (b) involving common ques-

the judges on the Panel are the specially trained judges who are ready and willing to take on cases with common questions of law or fact where large numbers of individuals have potentially been harmed, physically or economically, as a result of a catastrophe or as a result of a defective product.

The trial judge in the instant case has been an active participant on the Panel, and has aggressively worked to resolve mass litigation cases. In the instant case, it appears that he adopted the two-phase trial model that was used by judges in asbestos cases.

The defendants, however, insist that the bifurcation of these cases is improper. The defendants argue that they are entitled, pursuant to the due process clauses of the State and federal *Constitutions*, to try the question of punitive damages one case at a time, so that the jury can assess each defendant's culpability to each plaintiff individually. The defendants insist that the only way punitive damages may be reasonably related to the potential harm caused to an individual plaintiff is by a jury hearing evidence about both a defendant's conduct and the actual or potential harm to the plaintiff at the same time. In sum, the defendants assert that punitive damages can never be assessed in a "mass" litigation under Rule 42(a), or for that matter in a class action under Rule 23.

The inherent flaw with the defendants' argument is the assumption that due process, particularly to protect property rights, is a concrete concept. Instead, what process is due under the due process clause is determined under a sliding scale, and changes with the facts of each case. "When due process applies, it must be determined what process is due and consideration of what procedures due process may require under a given set of circumstances must begin with a determination of the precise nature of the

government function involved as well as the private interest that has been impaired by government action." Syllabus Point 2, *Bone v. W.Va. Dept. of Corrections*, 163 W.Va. 253, 255 S.E.2d 919 (1979). "(D)ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Necessarily implicit in the above quote, which was also expressed in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), is the principle that due process issues must be decided on the facts of the particular case. Once it is determined that due process applies, the question to be answered is "What process is due?"

The courtroom process that is due someone who has a few parking tickets is different from the procedural protections due a shoplifter, and vastly different from the process to be accorded someone who is accused of murder. And the due process protections for someone accused of a single murder are going to be different from someone accused of being a mass murderer, like Herman Goering or Saddam Hussein. Likewise, the amount of process that is due in a criminal case, where personal liberty or life is at stake, is different from the process that is due in a civil case, where only property interests are at stake.

The defendants argue that *State Farm v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), mandates that all evidence of punitive damages must be presented to the jury and heard in relation to the injury caused to each specific plaintiff. Ignoring the fact that *Campbell* involved one defendant who had caused harm to a husband and wife in one instance (and not dozens of defendants who caused harm to thousands of

tions of law or fact in "personal injury mass torts" allegedly incurred upon numerous claimants in connection with widely available or mass-marketed products and their manufacture, design, use, implantation, ingestion, or exposure; or (c) involving common questions of law or fact in "property damage mass torts" allegedly incurred upon numerous claimants in connection with claims for replacement or repair of allegedly defective products, including those in which claimants seek compensation for the failure of the product to perform as

intended with resulting damage to the product itself or other property, with or without personal injury overtones; or (d) involving common questions of law or fact in "economic loss" cases incurred by numerous claimants asserting defect claims similar to those in property damage circumstances which are in the nature of consumer fraud or warranty actions on a grand scale including allegations of the existence of a defect without actual product failure or injury.

plaintiffs over several decades), the defendants argue that *Campbell* preempts West Virginia's system of mass litigation. The inevitable result of accepting the defendants' argument is that it creates a judicial administrative nightmare. The same lawyers would be working for years, probably decades, to present the same witnesses to testify using the same documents in each separate plaintiff's case.

If the majority opinion had accepted this reasoning by the defendants, we would essentially be saying that the more people a defendant injures with its defective product, the less likely the defendant is ever going to have to pay compensatory or punitive damages to the people injured by the product. The defendant would therefore be accorded a right to thousands upon thousands of individual trials that would cause the legal system to grind to a halt. At the same time, we would be telling the individual plaintiffs that they have no rights to any process—because of administrative gridlock, the individual plaintiffs would *de facto* be denied their day in court. The majority opinion rightly rejected this position.

As the members of this Court have noted before, *State Farm v. Campbell* presented no new law in the field of punitive damages. The case was nothing more than a summary, a collation, of prior case law. *See Boyd v. Goffoli*, 216 W.Va. 552, 608 S.E.2d 169 (2004) (Davis, J., concurring) and (Starcher, J., concurring); *Jackson v. State Farm Mut. Auto. Ins.*, 215 W.Va. 634, 600 S.E.2d 346 (2004) (Davis, J., concurring) and (McGraw, J., concurring).

The due process protections mandated by *State Farm v. Campbell* and its predecessors are, as the majority opinion indicates, encompassed in the trial plan which the circuit court initially adopted. The first phase trial permits a jury to examine a defendant's relevant misconduct, and determine whether punitive damages should be assessed. If the jury believes that punitive damages are warranted, then the jury also determines a punitive damages multiplier that establishes a numerical relationship between the potential harm of a defendant's conduct and each plaintiff's compensatory damages. In the second phase proceeding, the trial judge actually multiplies the plaintiff's actual compensatory damages by the multiplier and establishes a punitive damages dollar figure. The circuit judge is then obligated by *Garnes* to review the punitive damages award to assess its fairness under the circumstances.

Under this process, thousands of allegedly injured plaintiffs will be permitted their day in court. The defendants will be permitted, in one proceeding instead of thousands, to contest the plaintiffs' claim that the defendants should pay punitive damages. And, if the trial judge determines this is the best course to take, the plaintiffs and the defendants will have secured the just, speedy, and inexpensive determination of every action.

I therefore concur in the majority's decision.

BENJAMIN, J., concurring.

I write separately to emphasize not only what the Court's opinion does, but also what it does not do. This unanimous opinion answers a narrow question in a narrow manner. It does no more. It does no less.

I think it important to underscore the essence of the Court's opinion:

After carefully considering the parties' arguments and the Supreme Court's decision in *Campbell*, this Court finds that *Campbell*, which did not involve mass tort litigation, does not per se preclude the circuit court's original trial plan. We emphasize that the question before this Court is a narrow one. Accordingly, our answer is strictly limited to this narrow question.[1] Our response is limited to the issue of

---

1. The certified question from the Circuit Court of Ohio County being:

Does the Due Process Clause of the Fourteenth Amendment to the Federal Constitution, as interpreted by *State Farm v. Campbell*, preclude a bifurcated trial plan in a consolidated action consisting of personal injury claims of approximately 1,000 individual smokers, wherein Phase I of the trial would decide certain elements of liability and a punitive damages multiplier and Phase II of the trial would decide for each plaintiff compensatory damages and punitive damages based upon the punitive damages multiplier determined in Phase I?

whether *State Farm v. Campbell* precludes a bifurcated trial plan like the one below. Further, we do not address whether there may be other legal reasons to question the circuit court's bifurcated trial plan. Nor do we, or indeed can we, address in the abstract the specific evidence that may be presented on the issue of reprehensibility. Our conclusion in this case simply is, first, we find nothing in *Campbell* that mandates a reexamination of our existing system of mass tort litigation. Second, we find nothing in *Campbell* that per se precludes a bifurcated trial plan in which a punitive damages multiplier is established prior to the determination of individual compensatory damages. Beyond this, we leave more specific issues for another day....

In this passage, the Court emphasizes the narrowness with which it approached and answered the certified question. In addition to twice stating that *Campbell* does not *"per se"* (by or in itself) preclude the circuit court's original trial plan, the Court twice specifically restricts its answer to the certified question, stating that we are "... not address[ing] whether there may be other legal reasons to question the circuit court's bifurcated trial plan" and "[n]or do we, or indeed can we, address in the abstract the specific evidence that may be presented on the issue of reprehensibility." These limitations merit attention.

Plaintiffs and defendants differ greatly herein on their views of the scope and commonality of the evidence of reprehensible conduct which may warrant consideration of punitive damages. Plaintiffs appear to contend that the evidence of reprehensible conduct is the same and applicable to all plaintiffs. In their amended brief, plaintiffs claim that all 1,000 of them "were harmed, not just by similar conduct, but by the exact same conduct—namely, defendants' fraudulent concealment of the known hazards of smoking." Thus, plaintiffs argue that this evidence is suitable for determining a single punitive damage multiplier for all of them. Since plaintiffs were all harmed by the same alleged conduct of defendants, plaintiffs contend that the trial court need not be concerned with similar and dissimilar conduct and that the jury, on the basis of this common reprehensible conduct, may apply one

punitive damage multiplier to whatever compensatory damages may be subsequently awarded.

Defendants, on the other hand, contend that the evidence is diverse with no sameness applicable to all plaintiffs. Defendants therefore contend that such evidence is unsuitable for determining a single punitive damage multiplier fitting to all claimants. They claim in their response that plaintiffs have not limited their damages claim to recovery for fraudulent concealment, but also that plaintiffs seek recovery "for negligence and strict liability in the design, manufacture, and warning labels of cigarettes; strict liability in selling an unreasonably dangerous product; negligence in testing and researching; and negligence in their advertising and in the sale of cigarettes to minors." Among other arguments, defendants contend that (1) evidence of concealment or failure to warn cannot be a basis of punitive damages for individual plaintiffs who were fully aware of the risks of smoking or of the facts supposedly concealed; (2) evidence relating to addiction cannot be a basis of punitive damages for individual plaintiffs who are not addicted; (3) evidence of misconduct in the 1950s or 1960s cannot be a basis of punitive damages for individual plaintiffs who didn't start smoking until the 1970s or 1980s; (4) evidence relating to light cigarettes cannot be a basis of punitive damages for smokers of unfiltered cigarettes; and (5) evidence relating to a particular defendant against whom a plaintiff is pursuing no claim should not be a basis for that individual plaintiff's punitive damages. Thus, defendants claim, a plaintiff could obtain (and some defendants could pay) punitive damages set by the application of a multiplier that was based on the misconduct of companies that those plaintiffs did not sue or on alleged reprehensible conduct of a defendant which is not even applicable to the specific plaintiff.

In responding to certified questions rather than in considering issues raised on properly perfected appeals, this Court necessarily lacks the intimate knowledge which the trial level circuit court has of all facets of the litigation below. We do not have a full and complete record before us in a consideration

of a certified question. We therefore cannot, and indeed should not, in my opinion, determine whether all plaintiffs were harmed by the exact same conduct, as the plaintiffs contend, or, if harmed at all, whether plaintiffs were harmed by diverse conducts of different defendants, the products of which all plaintiffs did not smoke, as the tobacco companies claim. Nor has the Court done so in its answer to the certified question. The Court's opinion does not discuss the divergent views of the parties with respect to the evidence of reprehensible conduct. Nor has the Court expressed a view on which conducts on the part of the defendants are similar and which are dissimilar. Without such factual determinations having first been made, daunting and complex as that process may ultimately prove to be, this Court is in no position, in my opinion, to say ultimately whether *Campbell*'s restricted view on evidence of reprehensibility, and the constitutional considerations which underlie such a view, would sanction a punitive damages multiplier as the circuit court's original two-phase trial plan envisioned. Judge Recht apparently thinks not, and I, for one, am in no position to disagree with him. Nor, as I read it, does the Court's opinion. In limiting its answer herein, the Court states that "[b]eyond [our limited response], we leave more specific issues for another day"; that "[m]atters such as a matrix and the use of a punitive damages multiplier, given the unresolved nature of the use of such mechanisms, can be better addressed by this Court upon appeals taken from final orders" quoting *State ex rel. Mobil Corp. v. Gaughan*, 211 W.Va. 106, 113, 563 S.E.2d 419, 426 (2002); and, most importantly, that "we decline to tell the circuit court how to proceed".[2]

There is yet another significant sentence in the Court's opinion which I believe needs emphasis: "[W]e do not address whether there may be other legal reasons to question the circuit court's bifurcated trial plan." Although not recently, this Court has said on many occasions that:

> Punitive damages should not be awarded in any case where the amount of compensatory damages is adequate to punish the defendant; and, in a case where such compensatory damages are not adequate for the purpose of punishment, only such additional amount should be awarded as, taken together with the compensatory damages, will sufficiently punish the defendant.

Syl. *Hess v. Marinari*, 81 W.Va. 500, 94 S.E. 968 (1918). *Accord, Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58, 63 (1895), *Fisher v. Fisher*, 89 W.Va. 199, 108 S.E. 872, 874 (1921); and *Raines v. Faulkner*, 131 W.Va. 10, 48 S.E.2d 393, 399 (1947).

The principle of *stare decisis* is a fundamental foundation of our system of jurisprudence. It is the source of the predictability, balance and stability in the legal system necessary to permit individuals and companies to structure their affairs and have confidence in the surety of their rights. It is, by any other consideration, a necessary aspect of the "fairness" which litigants should rightfully expect they will have in our courts and for which confidence in the judicial system will be advanced. The United States Supreme Court has spoken on the duty of courts to follow precedent on many occasions. In *Rodriguez de Quijas v. Shearson/American Exp.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989), the court admonished lower courts that "[i]f [its] precedent has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [the lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." I am not aware of any case

---

**2.** West Virginia is not alone in its concerns regarding the need for an efficient, yet procedurally proper, litigation of mass and complex civil cases. There may well be no "best" procedure for dealing with such cases in view of the differing nature of such cases. From my albeit limited research, I find that a number of jurisdictions have moved away from the type of trial plan originally proposed below, and I find no jurisdictions which have recently embraced such a plan. See, e.g., *Liggett Group Inc. v. Engle*, 853 So.2d 434, 451–2 (Fla.Ct.App.2003), *appeal granted*, 873 So.2d 1222 (Fla.2004); *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 752 A.2d 200, 249 (2000); *Southwestern Ref. Co. v. Bernal*, 22 S.W.3d 425 (Tex.2000); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 97 (W.D.Mo.1997). Whether this points to the presence of a trend that such a type of trial plan is now generally disfavored in the United States is not currently before this Court.

of this Court which disturbs our holding in *Marinari.*

The lower court should, in my opinion, consider whether the principles repeated in *Marinari* and its progeny, as well as the constitutional principles and protections applicable herein, present "other legal reasons to question the circuit court's bifurcated trial plan." It could be that a jury given the opportunity to consider the assessment of punitive damages after having awarded compensatory damages may conclude that the magnitude of the compensatory damages awarded does not warrant the assessment of further damages to punish the defendants. Likewise, such a jury may conclude that the magnitude of the compensatory damages when considered with the defendant's proven reprehensible conduct could require punitive damages in excess of what a uniform multiplier would otherwise provide.[3]

It is the circuit court's decision how to proceed. It is hoped that counsel for the parties will endeavor to provide the circuit court with such support, suggestions, and recommendations as the circuit court may request to best determine the proper trial plan to utilize in this litigation.

**3.** The Supreme Court in *Campbell* appears to have said as much when it stated that "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, *after having paid compensatory damages,* is so reprehensible as to warrant the imposition of *further* sanctions to achieve punishment or deterrence." 538 U.S. at 419, 123 S.Ct. 1513. (Emphasis added.) The quoted statement from *Campbell* is consistent with *Marinari* and its progeny.